# EXHIBIT A

| | | |
|---|---|---|
| RETURN DATE: SEPTEMBER 15, 2026 | : | SUPERIOR COURT |
| STATE OF CONNECTICUT | : | J.D. OF HARTFORD<br>AT HARTFORD |
| v. | : | |
| KALSHIEX LLC | : | AUGUST 26, 2026 |

# VERIFIED COMPLAINT

## INTRODUCTION

1. This case concerns Defendant KalshiEX LLC's ("Kalshi") offer of illegal sports wagers in Connecticut.

2. Since January 2025, Kalshi has offered sports wagers to Connecticut residents through kalshi.com, on the Kalshi app, and otherwise.

3. Kalshi's wagers are based on the outcomes of live sporting events, portions of live sporting events, future or propositional events during sporting events, and individual performance statistics of an athlete or athletes in a sporting event or a combination of sporting events, all for entertainment purposes.

4. These wagers blatantly violate Connecticut law, which requires that sports wagering operators be licensed by the Connecticut Department of Consumer Protection ("DCP") and adhere to strict statutory and regulatory constraints to protect Connecticut consumers who choose to participate in sports wagering, and violate the public policy thereunder.

5. Kalshi is not licensed by DCP, nor has it ever tried to become licensed.

6. Kalshi does not abide by the consumer safeguards that licensees must.

7. Kalshi has lied to Connecticut consumers and others, marketing its activities as "legal in all 50 states" and deceptively marketing its sports wagers as lawful alternatives to regulated, licensed sportsbooks, and even as "investments." As one

example, the below post reading: “The First Nationwide Legal Sports Betting Platform,” with a backdrop of a football field, appeared on Kalshi’s social media:




https://perma.cc/4CLZ-4Y2D.

8. Kalshi has filled its coffers by offering these wagers in Connecticut and elsewhere in violation of state law. As of May 7, 2026, Kalshi boasted a $22 billion valuation, claiming a staggering $178 billion in total trading volume on its platform.




https://perma.cc/59Q7-2X36.

9. By its own report to the United States District Court for the District of Connecticut, between 80 and 90 percent of Kalshi's offerings were sports event contracts as of February 2026. *KalshiEX LLC v. Cafferelli*, No. 25-cv-2016, 2026 U.S. Dist. LEXIS 178500, at *8 (D. Conn. Aug. 7, 2026) ("*Cafferelli*").

10. Because Kalshi charges a fee on each wager, Kalshi has an incentive to offer as many wagers as it possibly can, including to those under the age of 21 and those who struggle with gambling addiction.

11. Kalshi has boasted that it is "taking over America,"[1] and has claimed in courts across the country that Connecticut and other states are powerless to stop it.

12. In December 2025, DCP sent Kalshi and other prediction market providers

[1] https://perma.cc/HBA2-NMDY

cease-and-desist letters warning them of the illegality of these wagers and that failure to cease offering them may result in civil penalties or criminal penalties. Rather than comply, Kalshi sued State officials in federal court.

13. Kalshi contended that it was free to offer sports wagers nationwide because its wagers are actually a species of derivative product, and are, it claimed, subject only to federal regulation.

14. Kalshi's litigation attempt failed. On August 7, 2026, the United States District Court for the District of Connecticut, Oliver, J., roundly rejected Kalshi's legal theory, denying Kalshi a preliminary injunction against enforcement of Connecticut law as to its sports event contracts, such as this very suit.

15. In denying Kalshi's bid for an injunction, the Connecticut District Court joined federal or state courts in Maryland, Nevada, Massachusetts, Washington, Michigan, New York, Ohio, Arizona, and Utah, as well as the Sixth Circuit Court of Appeals in concluding as a matter of law that Kalshi's sports wagers are not swaps and/or are not subject to exclusive federal jurisdiction.[2]

16. The Connecticut District Court held that there is no federal protection for Kalshi's sports event contracts, concluding that "'at bottom, they are sports wagers,'" *Cafferelli*, 2026 U.S. Dist. LEXIS 178500, at *47 (quoting *KalshiEx, LLC v. Hendrick*, 817 F. Supp.3d 1014, 1029 (D. Nev. 2025)), subject to state law.

---

[2] *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 U.S. App. LEXIS 12260 (6th Cir. Apr. 24, 2026); *KalshiEX LLC v. Cox*, No. 26-CV-151, 2026 U.S. Dist. LEXIS 173686 (D. Utah Aug. 4, 2026); *KalshiEX LLC v. Williams*, No. 25-CV-8846, 2026 U.S. Dist. LEXIS 149977 (S.D.N.Y. July 13, 2026); *KalshiEX LLC v. Johnson*, No. 26-CV-1715, 2026 U.S. Dist. LEXIS 78807 (D. Ariz. Apr. 8, 2026); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025); *Nessel v. KalshiEX LLC*, 26-1087-CZ (Mi. Circuit Ct. June 29, 2026); *Nevada v. KalshiEX, LLC*, 26-0C-50 (Nev. Dist. Ct. July 24, 2026); *Massachusetts v. KalshiEX, LLC*, 2584-CV-2525 (Mass. Sup. Ct. Jan. 20, 2026).

17. Accordingly, the State brings this action to uphold Connecticut law and end Kalshi's illegal offer of sports wagers in Connecticut.

## AUTHORITY

18. This is an action for injunctive relief under C.G.S. § 12-861(c), as amended by P.A. 26-82, § 4, to restrain Kalshi's illegal offering, advertising, or making available to any resident of this state any sports wagering service without a license, and seeking such other or further relief as the court deems appropriate.

19. This is also an action under the Connecticut Unfair Trade Practices Act ("CUTPA"), Chapter 735a of the General Statutes, and more particularly C.G.S. § 42-110m, to obtain injunctive relief for Defendant's violation of C.G.S. § 42-110b(a), to obtain such other relief as may be necessary to address the injury to consumers resulting from Defendant's violations of law, for disgorgement of ill-gotten gains, for an accounting, and other appropriate relief pursuant to C.G.S. § 42-110m(a), for civil penalties pursuant to C.G.S. § 42-110o, and for such other relief the Court may deem appropriate.

## PARTIES

20. Plaintiff, State of Connecticut, is represented by William Tong, Attorney General, acting at the request of Bryan Cafferelli, Commissioner of Consumer Protection of the State of Connecticut, pursuant to C.G.S. § 12-861(c) and Chapter 735a of the General Statutes.

21. Defendant, KalshiEX LLC, is a Delaware limited liability company with its principal place of business in New York.

## JURISDICTION

22. The Court has jurisdiction under C.G.S. §§ 12-861(c) and 42-110b *et seq.*

**CONNECTICUT LAW PROHIBITS UNLICENSED WAGERING.**

23. Connecticut law prohibits unlawful wagering, including unlicensed sports wagering.

24. Our Supreme Court has noted an "ancient and deep-rooted public policy" against unlawful wagering dating to before Connecticut joined the Union. *See Ciampittiello v. Campitello*, 134 Conn. 51, 56 (1947) (noting 1778 statute prohibiting wagering on horse races).

25. The Court has observed that "[s]ince the establishment of our government[,] wagering has been held to be, if not absolutely immoral, yet so injurious in its results as to require suppression by penal legislation." *State v. Harbourne*, 70 Conn. 484, 490 (1898).

26. This policy is embodied in both criminal and civil statutes. C.G.S. § 53-278b(a) penalizes "gambling," or "solicit[ing] or induc[ing] another to engage in gambling," defined as "risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device," *id.* § 53-278a(2).

27. C.G.S. § 53-278b(b) criminalizes "professional gambling," defined as "accepting or offering to accept, for profit, money, credits, deposits or other things of value risked in gambling, or any claim thereon or interest therein," *id.* § 53-278a(3).

28. C.G.S. § 52-553 voids unlawful sports gambling contracts, providing in relevant part that, "[a]ll wagers, and all contracts and securities of which the whole or

any part of the consideration is money or other valuable thing won, laid or bet, at any game, horse race, sport or pastime, and all contracts to repay any money knowingly lent at the time and place of such game, race, sport or pastime, to any person so gaming, betting or wagering, or to repay any money lent to any person who, at such time and place, so pays, bets or wagers, shall be void...."

29. C.G.S. § 52-554 permits any person who loses money in an unlawful wager to sue the winner for their losses, providing in relevant part that, "[a]ny person who, by playing at any game, or betting on the sides or hands of such as play at any game, excluding any game permitted under chapter 226 or any activity not prohibited under the provisions of sections 53-278a to 53-278g, inclusive, loses the sum or value of one dollar in the whole and pays or delivers the same or any part thereof, may, within three months next following, recover from the winner the money or the value of the goods so lost and paid or delivered, with costs of suit in a civil action…".

30. In 2021, the General Assembly created a narrow exception to the prohibitions against gambling by establishing a tightly controlled, exclusive sports wagering market under DCP's regulation. P.A. 21-23; C.G.S. § 12-850 *et seq.*

31. Sports wagering must be "authorized by" or "conducted pursuant to" the regulatory scheme to be exempted from the criminal and civil prohibitions against gambling. C.G.S. §§ 52-553; 52-554; 53-278g(a); 53-278a(2).

32. Sports wagering is permitted only under the auspices of one of three "master wagering licensees": "the Mashantucket Pequot Tribe, or an instrumentality of or an affiliate wholly-owned by said tribe"; "the Mohegan Tribe of Indians of Connecticut, or an instrumentality of or an affiliate wholly-owned by said tribe"; or "the Connecticut

Lottery Corporation." *Id.* § 12-850(21).

33. Only a master wagering licensee, or a licensed entity on its behalf, may lawfully offer online sports wagering. *Id.* §§ 12-855; 12-857.

34. Licensees must ensure that users are in the State or on Tribal reservations in the State's borders when placing wagers. *Id.* § 12-863(a).

35. Licensees must pay significant revenue to the State in connection with their sports wagering receipts. Specifically, under C.G.S. § 12-867(a)(a), master wagering licensees licensed to operate sports wagering must pay 13-3/4 percent of the gross gaming revenue, defined in C.G.S. § 12-867(b), to the State for deposit in the General Fund.

36. Two percent of the amounts received by the State from master wagering licensees licensed to offer sports wagering must be deposited into a youth sports grant account that funds nonprofit youth sports organizations in distressed municipalities. *Id.* § 12-867(a)(2).

37. Connecticut's wagering laws serve at least five important public policies.

38. <u>First</u>, Connecticut law protects minors from gambling.

39. Gambling by minors poses unique, well-understood, and documented harms "not only because of direct and immediate consequences, but also because of the risk of longer-term effects on their life trajectories, loss of financial and employment prospects, and damage to their relationships, health, and wellbeing."[3]

40. Accordingly, Connecticut specifically prohibits sports wagering by those

[3] Wardle et al., *The Lancet Public Health Commission on Gambling*, Lancet Pub. Health, Vol. 9, No. 11, at e950 (Nov. 2024), https://www.sciencedirect.com/science/article/pii/S2468266724001671

under the age of 21. C.G.S. § 12-863(a)(1).

41. The law specifically prevents direct advertising of sports wagering to those under 21 and advertising targeted at those under 21. *E.g.*, C.G.S. § 12-863(e)(1), (2), (4), (5), (7)-(8); Regs. Conn. State Agencies §§ 12-865-25(e)(2), (3), (4), (6)-(8).

42. Second, Connecticut law seeks to prevent or mitigate gambling addiction and other forms of problem gaming.

43. Among other requirements, operators must offer self-exclusion options and self-spending limitations, C.G.S. § 12-863(c)(3) & (5), allowing users to limit their own gaming activity as appropriate.

44. Licensees must also provide disclosures about problem gaming, *id.* § 12-863(c)(6)-(7), and, where applicable, display information about the amount of time a user has spent on a gaming website or app and how much money remains in their accounts, *id.* § 12-863(c)(7).

45. Critically, licensees must also contribute $500,000 yearly in funding for gambling treatment and rehabilitation programs from wagering revenues and provide documentation to DCP regarding such contributions. *Id.* § 12-871.

46. Third, Connecticut law seeks to ensure the financial health and integrity of wagering companies to ensure they are able to pay winnings.

47. In addition to other measures, DCP regulations require independent auditing of master wagering licensees or online gaming operators, Regs. Conn. State Agencies § 12-865-28, and reserve accounts to ensure security of funds held on patrons' behalf. *Id.* § 12-865-11(k).

48. Fourth, state law protects the integrity of wagering and athletic contests in

Connecticut. DCP has an express statutory mandate to "protect the public interest and the integrity of gaming." C.G.S. § 12-865(13).

49. DCP regulations require licensees to maintain internal controls to "ensure the integrity of gaming and internet games in the state." *Id.* § 12-865-27(d)(17).

50. Similarly, state law expressly prohibits athletes, coaches, referees, owners, and others from participating in sports wagers that threaten the integrity of their competitions. *See* C.G.S. § 12-864.

51. State law prohibits wagering on Connecticut intercollegiate sports unless in connection with a permitted intercollegiate tournament. *See id.* §§ 12-850(32), (34).

52. Fifth, state law specifically restricts misleading or deceptive conduct in sports wagering, including:

a. Prohibiting inaccurate or misleading information that would reasonably be expected to confuse and mislead patrons in order to induce them to engage in gaming, C.G.S. § 12-863(e)(6);

b. Prohibiting claims and representations that imply greater chances of winning compared to other licensees, *id.* § 12-863(e)(9); and

c. Prohibiting claims and representations that gaming will guarantee an individual's social, financial or personal success, *id*. § 12-863(e)(11).

**KALSHI'S SPORTS WAGERS**

53. Kalshi is a financial technology company that operates a platform called a "prediction market," allowing users to take positions on real-world events through the trading of "event contracts."

54. An event contract generally takes the form of a yes-or-no proposition

about whether a future event will occur.

55. Event contracts are traded on exchanges, and their value depends on the exchange participants' expectations of the likelihood of the event occurring. For instance, an event contract might have a fixed value of $1. When the event settles or "resolves," those holding contracts corresponding to the correct outcome receive $1. If participants believe the given event is likely to occur, a "yes" contract might cost 75 cents, winning the holder the $1 and a net gain of 25 cents if it occurs; whereas the corresponding "no" contract would cost 25 cents, netting the holder 75 cents if the event does not occur.

56. Certain event contracts are classified as "swaps," a category of derivative whose trading is regulated under the federal Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("CEA"). *See* 7 U.S.C. §1a(47) (defining "swap").

57. Congress passed the CEA during the Great Depression to help protect against manipulation and excessive speculation in agricultural commodities futures trading. The CEA's scope has since expanded to include futures trading in virtually all commodities, including non-agricultural financial contracts.

58. As relevant here, to qualify as a swap, an event contract must, inter alia, be, "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

59. An event contract that qualifies as a CEA-regulated swap might include a contract on whether a natural disaster will occur in a certain city on a certain date. The hypothetical contract relates to the occurrence or nonoccurrence of the event (the

natural disaster), and the event is associated with various potential financial, economic or commercial consequences (*e.g.*, property damage, loss of business revenue, or economic disruption).

60. The trading of such a contract hedges against the financial risk of such a disaster occurring and it might have informational purposes, such as communicating the market participants' belief about the likelihood of the disaster occurring.

61. Kalshi's "sports event contracts" are nothing like the event contracts described above. Rather than pertaining to the occurrence of events of economic significance and allowing for legitimate risk hedging and information exchange, Kalshi's sports event contracts relate to the outcomes of, or happenings during, sporting events, which outcomes or happenings have no economic significance other than that people bet on them.

62. Kalshi's sports contract offerings include everything from: whether a team or player will win a sporting event or series; the number of wins a team will have in a season; league rankings; number of points scored in a match; point spread; and player statistics such as points scored or the method by which a match is won.

63. For some sports, Kalshi offers what it calls "combos," which are essentially parlays, and involve betting on whether a chain of specified sports outcomes will happen, such as whether multiple teams will win their games on the same day.

64. Kalshi has even offered contracts on whether a sports announcer will say the phrase, "What a catch."[4]

[4] https://perma.cc/AHJ2-VW6S

**Kalshi's Sports Event Contracts are Illegal Sports Wagers**

65. Kalshi's sports event contracts serve no legitimate hedging or informational purpose. They are simply a financial technology company's attempt to offer sports wagers without complying with state law.

66. As the Connecticut District Court and others have held, Kalshi's sports event contracts are not federally regulated financial derivatives.

67. Kalshi's sports event contracts are sports wagers under another name and their unlicensed offer in Connecticut is illegal, including under General Statutes § 53-278b, which criminalizes "professional gambling."

68. General Statues § 53-278a defines "professional gambling" as "accepting or offering to accept, for profit, money, credits, deposits or other things of value risked in gambling, or any claim thereon or interest therein," C.G.S. § 53-278a(3), and "gambling," in relevant part, as "risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon…chance…." *Id.* § 53-278a(2).

69. Kalshi offers wagers on its prediction market that relate to the possibility of a specified outcome or outcomes of sporting events, such as the winner, points scored, and individual athletic achievements, all items over which the user has no influence or control and are therefore subject to chance.

70. Kalshi offers these wagers to Connecticut residents, allowing them to create Kalshi accounts, deposit funds, and trade contracts.

71. Kalshi's users risk money on its sports event contracts by paying Kalshi or an associated company for the cost of each contract traded, depositing the full amount necessary to make the trade(s) up front.

72. Kalshi earns a profit by charging a fee on each contract traded.

73. Thus, through the offer of sports wagers on its prediction market, Kalshi accepts or offers to accept, for profit, money, credits, deposits or other things of value risked in gambling.

74. Kalshi's conduct does not satisfy the sports wagering exceptions from criminal gambling liability under C.G.S. § 53-278a(2) or C.G.S. § 53-278g(a), which apply only to wagering activity "authorized by" or "conducted pursuant to" chapter 229b of the General Statutes, or any other exceptions.

**Kalshi's Sports Event Contracts Violate Connecticut Law and Public Policy**

75. Beyond the plain violation of C.G.S. § 53-278a, Kalshi violates the clear statutory and regulatory provisions cited above, and the public policy thereunder, by offering its sports wagers in Connecticut outside the regulated marketplace.

76. First, Kalshi permits minors to partake in sports wagers and has directly advertised to minors. For these purposes, "minor" is defined as one under the age of 21. C.G.S. § 12-863(a)(1).

77. Kalshi makes its platform available to anyone 18 years old or older. Kalshi specifically allows minors to create accounts and place wagers on sporting events.

78. This means that many high school students may make Kalshi accounts and wager on sports.

79. Beyond permitting minors to place sports wagers, Kalshi directly advertises to individuals under 21 by advertising either directly or through paid influencers who Kalshi believes will appeal to those under 21.

80. Minors have admitted being paid by Kalshi to create content promoting the

company, including posts on TikTok, a social media platform commonly used by young people.

81. Kalshi even briefly engaged a 15-year-old videogame streamer as an affiliate to promote Kalshi on the social media platform X.

82. Kalshi has also directly marketed its platform on college and university campuses. Specifically, in 2025 Kalshi made a post on X promoting a "Kalshi Ambassador Program" targeted at Yale University among other colleges and inviting Connecticut college students to place sports wagers on the platform.

83. Second, Kalshi fails to take appropriate measures to curb problem gambling.

84. Kalshi does not provide the same problem gambling prevention tools as are required in Connecticut's regulated sports wagering marketplace.

85. Kalshi fails, for example, to provide information about state-approved problem gambling resources; clearly display the amount of time an individual has spent on the web site or mobile application; and allow a person to limit the amount of money that may be deposited into an account and spent per day.

86. Prior to March 2025, Kalshi did not offer voluntary self-exclusion options. On information and belief, while Kalshi presently offers a voluntary self-exclusion to its users, this option, unlike the legitimate self-exclusion program administered under State law, lacks a state enforcement mechanism and is not populated with the names of those on the State's self-exclusion list.

87. In addition, on information and belief, even when a user opts in to Kalshi's self-exclusion option, Kalshi does not exclude users from placing sports wagers on third

party sites or mobile applications that offer Kalshi's sports wagers.

88. Relatedly, unlike a licensee, Kalshi does not pay any revenue on its sports wagers conducted in Connecticut, diverting revenue from the State's problem gambling support programs.

89. Third, Kalshi does not provide satisfactory assurances to users or Connecticut regulators as to its financial condition.

90. On information and belief, Kalshi does not submit and make available to a third-party regulator an independent audit of its books and accounts at least once each fiscal year as Connecticut's licensees must. Regs. Conn. State Agencies § 12-865-28(b).

91. On information and belief, Kalshi also does not comply with Regulations of Connecticut State Agencies § 12-865-28(e), which requires online gaming operators to disclose on an annual basis all related-party transactions on their platforms, including transactions involving owners, directors, or executive officers.

92. Fourth, Kalshi does not take appropriate measures to ensure the integrity of its wagering operations or of sports events in this State.

93. On information and belief, Kalshi, unlike regulated sportsbooks, does not participate in a third-party integrity monitoring service to share and receive reports of wagers that give concern for manipulation and improper influence.

94. Further, Kalshi does not prohibit Connecticut users from wagering on Connecticut intercollegiate sports teams, in violation of Connecticut law.

95. Specifically, Kalshi has offered contracts relating to the outcomes of single games played by Connecticut college sports teams, including, at least, UCONN, Yale

University, Sacred Heart University, University of New Haven, Fairfield University, and Quinnipiac University, which are specifically excluded from the definition of "sporting event" on which sports wagering is permitted. C.G.S. § 12-850(32).

96. Fifth, Kalshi's advertising is false or misleading.

97. Kalshi has falsely stated or implied that its sports wagers are legal in all 50 states.

98. Kalshi often implies in its advertisements that users have a greater chance of winning compared to sportsbooks participating in the regulated marketplace, in violation of Connecticut's advertising and marketing requirement that master wagering licensees not imply greater chances of winning compared to other licensees. *Id.* § 12-863(e)(9).

99. Kalshi has also expressly characterized its event contracts to consumers as "investments" and uses investment terminology such as "trading," "financial strategy," "price fluctuations," and "market risk" in its marketing and informational materials, falsely implying that wagers are akin to traditional saving or investment vehicles and may provide financial security, when in reality they are risky sports bets.

**COUNT ONE: INJUNCTIVE RELIEF UNDER § 12-861(c)**

100. The allegations in paragraphs 1 through 99 are incorporated by reference as if fully set forth here.

101. Kalshi offers an electronic wagering platform through which Connecticut residents may risk money, credit, deposits, or other things of value for gain contingent in whole or in part based on a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event, and/or the

individual performance statistics of an athlete or athletes in a sporting event or a combination of sporting events.

102. Therefore, Kalshi offers "sports wagering" to Connecticut residents under the meaning of General Statutes § 12-850(34).

103. Kalshi does not have, and has never had, a license to offer a sports wagering service in Connecticut as required by Title 12 of the Connecticut General Statutes.

104. Therefore, under General Statutes § 12-861(c), State is entitled to an injunction permanently restraining and enjoining Kalshi from offering a sports wagering service in Connecticut without a license, along with the other relief sought in its prayer for relief.

**COUNT TWO: CUTPA (UNFAIRNESS – ILLEGAL SPORTS WAGERING)**

105. The allegations in paragraphs 1 through 104 are incorporated by reference as if fully set forth here.

106. At all relevant times, Kalshi has been engaged in trade or commerce in the State of Connecticut for the purposes of C.G.S. § 42-110b(a) in that it has advertised, sold, offered, or distributed services in this State through its operation of a prediction market both available for, and marketed to, Connecticut residents.

107. By engaging in the aforesaid acts and practices, including offering sports wagers in this State without a license and without complying with Connecticut law governing sports wagering, Kalshi has violated numerous public policies, including those: against illegal gambling including as embodied in C.G.S. § 53-278b; against underage wagering including as embodied in C.G.S. § 12-863(a) *et seq.*; against problem gambling including as embodied in C.G.S. §§ 12-863(c) and 12-871; in favor of

ensuring the financial health and integrity of sports wagering providers, including as embodied in Regs. Conn. State Agencies §§ 12-865-11 and -28; in favor of integrity in wagering and in intercollegiate and other sports events, including as embodied in C.G.S. §§ 12-865(13); 12-864 and 12-850(32) and Regs. Conn. State Agencies §12-865-27(d); and against misleading or deceptive advertising of sports wagering services, including as embodied in C.G.S. § 12-863.

108. Kalshi's aforesaid acts and practices are oppressive, unethical, immoral, and/or unscrupulous.

109. Kalshi's aforesaid acts and practices have caused, are causing, and/or will cause substantial injury to Connecticut consumers in that they:

a. Cause or encourage Connecticut residents to engage in gambling conduct that violates Connecticut criminal and civil law;

b. Charge and collect trading fees from Connecticut residents in connection with each unlawful wager;

c. Expose Connecticut residents, specifically including minors and those struggling with gambling addition, to harm from problem gambling unmitigated by the protections imposed by Connecticut law; and

d. Cause or encourage Connecticut residents to trade contracts that are unenforceable under C.G.S. § 52-553.

110. Kalshi's aforesaid acts and practices therefore constitute unfair acts or practices in violation of General Statutes § 42-110b(a).

**COUNT THREE: CUTPA (UNFAIRNESS – UNDERAGE GAMBLING)**

111. The allegations in paragraphs 1 through 110 are incorporated by reference as if fully set forth here.

112. At all relevant times, Kalshi has been engaged in trade or commerce in the State of Connecticut for the purposes of C.G.S. § 42-110b(a) in that it has

advertised, sold, offered, or distributed services in this State through its operation of a prediction market both available for, and marketed to, Connecticut residents.

113. By engaging in the aforesaid acts and practices, including permitting those under age 21 to create accounts and place sports wagers; not restricting advertisements to those under the age of 21; and directing advertisements to those under the age of 21, Kalshi has violated the public policies against gambling by minors and against advertising gambling to minors.

114. Kalshi's aforesaid acts and practices are oppressive, unethical, immoral, and/or unscrupulous.

115. Kalshi's aforesaid acts and practices caused substantial injuries to Connecticut consumers in that they:

a. Cause or encourage Connecticut residents under the age of 21 to place sports wagers;

b. Expose and directly target a vulnerable population of Connecticut residents that is more susceptible to the harms of problem gambling and gambling addiction; and

c. Charge and collect fees from Connecticut residents under the age of 21 in connection with its unlawful conduct.

116. Kalshi's aforesaid acts and practices therefore constitute unfair acts or practices in violation of General Statutes § 42-110b(a).

**COUNT FOUR: CUTPA (DECEPTION)**

117. The allegations in paragraphs 1 through 116 are incorporated by reference as if fully set forth here.

118. At all relevant times, Kalshi has been engaged in trade or commerce in the State of Connecticut for the purposes of C.G.S. § 42-110b(a) in that it has

advertised, sold, offered, or distributed services in this State through its operation of a prediction market both available for, and marketed to, Connecticut residents.

119. Kalshi's acts and practices, as described herein, are deceptive in that Kalshi made untrue and misleading statements and omissions to Connecticut consumers regarding material facts that were likely to mislead consumers acting reasonably under the circumstances including by:

a. Falsely claiming that Kalshi's sports wagers are "legal" in all states, when they are illegal in Connecticut;

b. Falsely claiming or implying that sports wagers transacted through Kalshi's prediction market are enforceable in Connecticut despite the operation of C.G.S. § 52-553; and

c. Falsely claiming or implying that Kalshi's sports wagers are investment products that may provide financial security, rather than risky sports wagers.

120. Kalshi's aforesaid acts and practices therefore constitute deceptive acts or practices in violation of General Statutes § 42-110b(a).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff claims the following relief:

1. A temporary and permanent injunction pursuant to General Statutes § 12-861(c) enjoining Kalshi from further offering any sports wagering service or other conduct for which a license is required under Title 12 of the Connecticut General Statutes;

2. An order pursuant to General Statutes § 12-861(c) requiring disgorgement of all revenues received by Kalshi through its unlawful operation of a sports wagering service or other conduct for which a license was required under Title 12 of the Connecticut General Statutes or, in the alternative, requiring disgorgement in the amount of all taxes, fees, and contributions which Kalshi, were it a licensee, would have been obligated to remit;

3. A temporary and permanent injunction pursuant to General Statutes § 42-110m(a), enjoining the Defendants from further violation of General Statutes § 42-110b(a).

4. An order pursuant to General Statutes § 42-110m(a), directing the Defendants to pay restitution.

5. An order pursuant to General Statutes § 42-110o(b), directing the Defendants to pay civil penalties for each willful violation of General Statutes § 42-110b(a).

6. An order pursuant to General Statutes § 42-110m(a), directing the Defendants to disgorge all revenues, profits and gains achieved in whole or in part through the unfair and/or deceptive acts or practices complained of herein.

7. An award of attorneys' fees, pursuant to General Statutes § 42-110m(a).

8. Such other and further relief as the Court deems appropriate.

Plaintiff states that the amount in demand exceeds fifteen thousand dollars ($15,000), exclusive of interests and costs.

STATE OF CONNECTICUT
WILLIAM TONG
ATTORNEY GENERAL

By: *_/s/ Joseph Gasser_*
Joseph Gasser, Juris No. 443231
Michael Nunes, Juris No. 444379
Assistant Attorneys General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Phone: 860-808-5400
Fax: 860-808-5593
Joseph.Gasser@ct.gov
Michael.Nunes@ct.gov

**VERIFICATION**

I, Jeffrey Hakala, Supervising Special Investigator for Gaming for the Department of Consumer Protection, being over the age of 18 and understanding the obligations of an oath, have examined the contents of the foregoing Verified Complaint and I hereby verify to the best of my knowledge that all of the allegations set forth in said Verified Complaint are true and accurate.

JEFFREY HAKALA
SUPERVISING SPECIAL INVESTIGATOR – GAMING
Connecticut Department of Consumer Protection

Subscribed and sworn to before me on this 25th day of August, 2026:

Notary Public /
Commissioner of the Superior Court

Date Commission Expires: